[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. It is found that all of the allegations of plaintiff's complaint have been proven, that the marriage has broken down irretrievably, and the marriage is ordered dissolved for that reason.
II. The Consideration of the "Pre-Marital" Claims of the Parties
Each of the parties asserts that certain property of value was owned by him or her at the time of their marriage and that neither that property nor in some cases its appreciation in value during the marriage should be considered part of the marital estate for purposes of distribution by the court. Plaintiff's claims are less complex than those of defendant and will be first addressed.
Plaintiff
A. After reviewing the financial affidavit filed by plaintiff at the time of the dissolution of her first marriage on February 5, 1976, the court judgment rendered at that time, plaintiff's testimony during the present trial, and related exhibits, this court concludes that plaintiff's pre-marital assets total $40,952.
B. C.M. Annuity — $10,500
This sum, properly listed on plaintiffs current financial affidavit, represents the balance remaining of a $20,000 bequest to her from her deceased father and CT Page 20-A should not be considered a marital asset.
C. $100,000 Trust for Plaintiff's Mother
This sum is being held by plaintiff in trust for her mother who is eighty-one years old. On this subject defendant stated, "We don't claim that this is anything but her mother's money." This Court agrees and excludes the trust from the marital estate.
Defendant
Each of defendant's assets in dispute will now be examined by this court in order to determine the manner in which it should be treated. In each analysis the following questions are deemed appropriate:
1. Is the property in question a pre-marital asset?
2. If so, is the owner entitled to the appreciation in value of the asset during the marriage? How did the parties treat the asset? Did the non-owner contribute in any way to the appreciation?
3. If not, what was the status of the asset on the date of dissolution? Can it be identified? To what use was the asset put? Can its ultimate destination be traced?
The answers to these questions found in the evidence should be most helpful in assisting the court to resolve the troublesome questions herein presented.
Of considerable aid at the onset is the testimony of plaintiff on this issue which is summarized as follows;
1. "I never had a joint account with him. He was in charge of the finances. Each month he'd put money in my checking account for household purposes."
2. "I didn't have anything to do with the increase in value of his real estate interests. I wasn't familiar with them."
With the above as background, the court begins its unenviable task. CT Page 20-B
A. No. 1041 Blue Hills Avenue, Bloomfield, CT
This parcel of land at the corner of Park Avenue and Blue Hills Avenue, Bloomfield, CT was valued by defendant at $70,000 at the time of his first divorce on April 8, 1976. During this trial Peter Marsele, defendant's qualified real estate appraiser, valued the property at $100,000 as of that date. Plaintiff's appraiser valued the property at $55,000 at that time. A portion of the property was sold for $95,000 on December 11, 1981 and the remainder sold for $112,500 on February 26, 1990 for a total sale price of $207,500. Defendant claims the entire amount, including the appreciation in value of the property during the marriage, as a pre-marital asset.
The court must determine what portion of the proceeds from the sale of the above property should be considered a pre-marital asset.
Both because of defendant's appraisal background and his statement under oath on his financial affidavit on the occasion of his first divorce two months prior to his marriage to plaintiff, it is determined that the premarital value of the above property is $70,000.
Concerning that portion which was sold for $95,000 on December 11, 1981 defendant testified that the proceeds went directly into the construction and restoration of the Simsbury home owned jointly by the parties. This court considers the $95,000 in the nature of a gift from the defendant to the marital partnership, or to the marriage, and defendant's claim that the appreciation be considered a pre-marital asset is disapproved. This ruling in no way prevents the court from otherwise giving consideration to defendant's gift under the "contributions of the parties" portion of § 46b-81c C.G.S.
With reference, to the remaining part of this tract sold for $112,500 on February 26, 1990, this court notes that the sale occurred little more than a year before this action was commenced and at a time when defendant was deeply involved in the construction and financing of the Florida home owned solely by him. It is concluded CT Page 20-C that these proceeds can be traced to the Jupiter property and consequently this appreciation should be excluded from the marital estate of the parties.
It is therefore found that the sum of $70,000 together with appreciation in the amount of $42,500 for a total of $112,500 should be credited to defendant as a pre-marital asset.
B. Gozzo and Barall No. 1154 Blue Hills Avenue, Bloomfield, CT
Defendant on his April 8, 1976 financial affidavit valued his one-half interest in this parcel at $25,000. Peter Marsele, his appraiser, valued his interest as of that date at $30,000. Richard Mahoney, plaintiff's appraiser, valued it on that date at $21,500. Defendant's interest in the property was sold on September 19, 1985 for $75,000. Defendant claims the entire sum of $75,000 as a deduction from the marital estate.
The sum of $25,000 is without question a marital asset. Defendant is bound by the value established by him in his financial affidavit. The subsequent transfer occurred less than two years prior to defendant's purchase of a building lot in Jupiter, Florida for $137,000. It is concluded in the evidence that the proceeds of the sale can be traced to the Jupiter property and as a result the entire sum of $75,000 is allowed as a deduction from the marital estate in favor of defendant.
C. Bloomfield Avenue Realty Associates #705 Bloomfield Avenue, Bloomfield, CT
The court's task in first comprehending and then substantiating defendant's assertion that his pre-marital interest in this partnership be valued at $55,000 has not been simple. Its analysis is as follows: On the date of his present marriage, defendant was the owner of a ten percent interest in the partnership, having acquired a five percent interest from his first wife at the time they were divorced. He valued his interest at $10,000. This the court has substantially confirmed from an CT Page 20-D examination of the sale price of properties owned by the Associates and described in plaintiff's exhibit "U". Defendant also had a bond for deed to purchase Lot 2006 from the partnership, and on which he had made a $15,000 deposit. He later in 1977 assigned the bond for deed to Richard O. Bronson, receiving from him $30,000 together with the return of his $15,000 deposit. That $45,000 together with his ten percent interest in the partnership valued at $10,000 totals $55,000. Lot 2006 was sold by the Associates to Richard O. Bronson, et al. on December 30, 1977 for $110,000. Defendant's valuation has thus been confirmed to the satisfaction of the court.
Plaintiff's contention that inasmuch as the bond for deed was not signed it was of no value is without merit. If all of the parties treated the agreement as binding, as was the case as borne out by the evidence, potential legal defects may be disregarded.
Defendant has made no claim for appreciation on this parcel and none is awarded.
Based on all the evidence, the court values this pre-marital asset of defendant at $55,000.
D. Silver Nutmeg Associates A/K/A P.G.S.
This real estate partnership included David Sayadoff, Roger Pace, Anthony Donatelli and Joseph Gozzo, defendant having a twenty-five percent interest. Defendant has valued this interest at $25,000 when he married plaintiff. Silver Nutmeg was omitted from his April 8, 1976 financial affidavit, and this error was never thereafter corrected.
This asset can be traced to the P.G.S. Realty mortgage listed in defendant's current financial affidavit. Of greater significance, however, is the court's belief in the impropriety of permitting defendant to now include as a pre-marital asset property which, if it had properly been included in his April 8, 1976 financial affidavit, might very well have resulted in a different and less favorable judgment for him at the time of his first divorce. Consequently, defendant's interest in this partnership is found not to be a pre-marital CT Page 20-E asset.
E. Bloomfield State Bank Stock
On defendant's April 8, 1976 financial affidavit he listed himself as the owner of 30,381 shares of stock in the Bloomfield State Bank which he valued at $30,381. He sold this stock on June 11, 1987 for $162,000. Defendant claims the entire amount as a pre-marital deduction.
The court notes that this stock is easily identifiable as a pre-marital asset, that plaintiff in no way contributed to its increase in value, and that the proceeds resulting from its sale may be traced without difficulty to the Jupiter property owned solely by defendant. As a result the entire sum of $162,000 may be considered a pre-marital asset of defendant.
F. The Consideration of Other Items Appearing on Defendant's April 8, 1976 Financial Affidavit
1. The motor vehicles and other personal property listed on defendant's affidavit are, on this issue, considered in the same category as clothing or perishables by this court and not as pre-marital assets.
2. The sum of $6,000 at Bloomfield State Bank less $2,500 defendant was required to pay as attorney's fees for a net amount of $3,500 is allowed as a pre-marital asset.
3. The cash surrender value of life insurance policies listed on defendant's affidavit in the total amount of $13,460 may be considered a pre-marital asset. Total of pre-marital assets in "F" $16,960.
G. Other considerations
1. Defendant requests that the court consider a pre-marital asset the sum of $2,000 representing an informal division of cash between him and his wife and not included on his financial affidavit.
This request is denied without comment. CT Page 20-F
2. Defendant claims a deduction of $2,500 representing his interest in a condominium acquired after his first divorce and prior to his present marriage.
The evidence bears out defendant's claim that this should be considered a pre-marital asset, and it is so found.
Conclusion/RecapitulationPer-Marital Assets of Defendant
No. 1041 Blue Hills Avenue $112,500 Guzzo [Gozzo] and Barall 75,000 Bloomfield Avenue Realty Associates 55,000 Silver Nutmeg Associates --- Bloomfield State Bank Stock 162,000 Other Items ("F" above) 16,960 Other Considerations 2,500 Total $423,960 Less Plaintiff's pre-marital assets — 40,952 Net pre-marital credit awarded defendant $383,008
III. Further Considerations Prior to the Establishment of the Marital Estate of the Parties
A. Defendant's Debt To His Son Gregory Gozzo
Defendant's current financial affidavit includes a second mortgage in the amount of $80,000 in the Jupiter property, title to which stands in defendant's name alone. This court must determine whether the marital estate of the parties should be reduced by this amount before distribution is made.
The facts on this issue are as follows: In 1988 defendant's son Gregory Gozzo, acting as general contractor, directed the construction of a new home for defendant in Jupiter, Florida. Gregory testified that it cost $400,000 to build the home (over and above the $137,000 cost of the lot) and that under normal circumstances he would also have been entitled to an additional twenty percent as overheard together with a further twenty percent as his profit. The defendant gave his son a Rolex watch after the work was completed. CT Page 20-G Also, on November 2, 1988 defendant and his son entered into an agreement under the terms of which the son "would be entitled to receive the sum of $100,000 in payment for his services" in the event of the sale of defendant's Jupiter property during defendant's lifetime. The agreement further provided that it would be binding on the heirs, successors and assigns of the defendant and would terminate in the event of the death of defendant prior to the transfer of the property.
The defendant testified that on June 17, 1991 he withdrew $20,000 in cash from his savings account which he paid to his son by way of reducing the debt. He added that "I have no evidence that I gave it to Greg." The "Agreement" does include a notation that the note was reduced by $20,000 on July 8, 1991. The Agreement is the only written evidence of defendant's debt to his son. There is in fact no second mortgage on the Jupiter property securing this so-called note.
This court notes that the agreement between defendant and his son Gregory reflects a possible personal debt of defendant to his son which under certain circumstances (i.e. if either defendant or son Gregory died before the property was sold) would never become due. Because of the uncertainty that the holder of the "note" would ever recover any balance due, and the further problem that it was not in fact secured by a second mortgage (contrary to the representation on defendant's current financial affidavit), it is concluded that this instrument mirrors only a very personal agreement between father and son, and that under no circumstances should any balance due on it be considered a legitimate reduction of the marital estate of the parties.
B. Defendant's Household Furnishings in Jupiter, Florida
The determination of the value of defendant's substantial household furnishings presents an unnecessary problem for the court inasmuch as defendant attributed a "value unknown" to them, and plaintiff may only speculate from a distance of 1500 miles. Because the house was constructed and furnished about five years ago, because CT Page 20-H plaintiffs Exhibit F indicates expenditures by defendant in the amount of $63,200 for furniture, plants and art work at that location, and because plaintiff's Exhibit G, a series of photographs of the Jupiter residence, reveals both professional good taste and a disregard for expense in the furnishing of the home, this court is understandably reluctant to follow defendant's inviting example and to also attribute no value to the household contents.
Having received no assistance from defendant on a matter which is monetarily more significant than in most cases involving household furnishings which it has heard, this court, on the evidence assigns a value of $25,000 to this property.
If defendant does not accept the court's valuation, the household furnishings are ordered sold and the net proceeds therefrom, after crediting to defendant the sum of $2,500 (the value plaintiff conservatively but helpfully assigned to her household furnishings on her financial affidavit) are ordered divided equally between the parties.
C. The Value of Defendant's Home in Jupiter, Florida
Richard C. Sheehan, Defendant's qualified real estate appraiser, valued the property at $546,000. Defendant testified that his home was on the market for sale and in valuing the property on his financial affidavit at $508,648 he deducted potential real estate commission, documentary stamps, title insurance, and the like.
This court declines to adopt defendant's valuation, believing that it is too speculative at this time in as much as the property has not as yet been sold. It establishes the value of the Jupiter home at $546,000.
IV. The Adjusted Gross Marital Estate of the Parties Plaintiff (wife)
CT Page 20-I
Condominium, Albany Ave. Value $151,000 $ 29,600 West Hartford, CT -Mtg. -121,400 Equity $29,600 Household Furnishings 2,500 Jewelry 3,500 Fleet Bank 200 1/2 Escrow in Shawmut Bank 178,558 CM Annuity Plan — a pre-marital asset $10,500 --- I.R.A. Union Trust (tax consequences not considered) 9,800 Trust Fund for mother — $100,000 (not a marital asset) --- Total $224,158
Defendant (husband
No. 156 Commodore Drive Value $546,000 $390,000 Jupiter Florida -Mtg. -156,000 Equity $390,000 1984 Cadillac El Dorado 4,000 1993 Toyota 15,000 Household Furnishings 25,000 Bank Accounts 18,800 Stock 47,500 Life Insurance (C.S.V.) 1,358 I.R.A. 107,000 1/2 Escrow in Shawmut Bank 178,558 P.G.S. Mortgage 37,500 Admiral's Cove Golf Membership 25,575 Gun Collection (stipulation) 4,840 Total $855,131
Total Adjusted gross marital estate $1,079,289 Less pre-marital credit to defendant — 383,008 Total estate on hand for distribution $696,281
V. The Evaluation of the Evidence in Accordance with the Provisions of Section 46b-81c C.G.S.
The plaintiff wife, who is fifty-three years of age, and the defendant husband, who is sixty-six, were married on June 5, 1976, seventeen years ago. It was the second marriage for each of them, plaintiff having been divorced from her first husband on February 15, 1976 and defendant CT Page 20-J from his first wife on April 8, 1976. The defendant has two adult sons issue of his first marriage.
Plaintiff completed high school, more recently graduated from both Bay Path College and Hartford Secretarial School and was not working when she first met defendant. During the early years of their marriage she was employed as a secretary for an attorney in Farmington.
Defendant attended Hartford Public High School for two years, then transferred to Hartford Trade School. He was employed for a short time thereafter as a mechanic at O'Meara Motors in East Hartford. Following that he served in the United States Navy from 1944 to 1946. He was married in 1948, obtained his high school diploma by attending night classes, and thereafter, making use of the G.I. Bill, obtained an A.A. degree from Hillyer College after five years of evening classes. His employment and personal history from that time until his present marriage was an American success story. He opened a service station on Granby Street, Bloomfield in 1957. He joined the Chamber of Commerce, became a member of the town council and later was elected mayor of Bloomfield. In 1971 he helped organize a new bank in town, the Bloomfield State Bank, and in 1974 resigned as mayor to become its president. He held this position, earning $673 per week gross when he married the plaintiff.
After the parties married they resided for two years in a condominium at Farmington Woods, moving thereafter to a home they had bought in Simsbury. Defendant continued his success in the field of finance, and also in the real estate market. With all his activities he had still managed to take several appraisal courses and had obtained a real estate salesman's license. He became active in the Connecticut Banker's Association. Bank dividends increased annually while he was president, and in 1988 the bank merged with Union Trust Company, he being named Senior Executive Vice President as a result. In 1990 he elected to take "early retirement" with severance pay, thereafter transferring to the Bank of East Hartford as its C.E.O. at an annual salary of $120,000. On December 13, 1991 that bank closed and he has not been gainfully employed since that time. His CT Page 20-K current financial affidavit reflects a weekly net income of $1,114 coming from social security, pension, deferred compensation and interest.
Plaintiff ceased full time employment in 1978, working part time for defendant's brother until 1982. From that time until the separation of the parties in 1991 she performed the duties of a helpmate and housewife to her husband. In 1992 she attended secretarial school for seven months, familiarizing herself with the operations of a computer and word processor. She completed twelve courses, obtained straight A grades and in July, 1992 began her present employment as a secretary at Cigna. Her most recent financial affidavit indicates a gross weekly income of $429, with a net after the usual deductions, not including pension of $288.
Fault
The following highlights of the testimony of the parties are herein set forth as a basis for the conclusion of the court on this issue:
Plaintiff:
 "It was a very good marriage in the early years. I thought we were a good team. I had dinner parties for his colleagues. I prepared a dress code and attendance policies for the bank. We attended bank gatherings and community functions. I was pleased to meet some of his friends. He wanted his meals ready when he came home from work, and I liked to cook."
Gradually, however, the even tenor of the marriage changed. Plaintiff described their first Christmas together as follows:
 "I had tried to decorate the condo and had accidentally sprayed snow powder on his bear rug. He yelled and cursed at me, causing me to run out of the house. It was as if he was having a spell. I walked around the golf course until I was frozen. When I came back he CT Page 20-L grabbed my wrist and said he was leaving. He got into his car and left, returning a few hours later. I spent the next fifteen years walking on razor blades when I was around him."
The remainder of their time together was marked by similar incidents, resulting principally from defendant's quick temper. In plaintiff's words "he never beat, punched or slapped me, but he would push and shove me he'd tweak my nose." He occasionally ridiculed her in front of friends saying such things as "do you think her nose should be used for a plough or a can opener?"
The final quarrel between the parties occurred on Derby Day, the first Saturday in May, 1991 when they were having dinner at the Wanipauaug Country Club. Defendant drove home alone early in a bad mood, and pushed plaintiff to the bedroom floor when she returned. She spent the night in the guest room, and consulted an attorney preliminarily to these proceedings about one month later.
Plaintiff summarized the causes for the marital breakdown as follows "Five or six years ago he made it clear that he was no longer interested in me. He'd say `don't be a pest' when I showed affection for him." She described his principal interest in life as the new home in Florida which was constructed by his son Gregory.
Refusing to blame defendant completely for the breakdown of their marriage, plaintiff concluded "In a benign way I was partly responsible. I prepared his meals, ironed, washed, entertained, went without, did a darn good job, but I failed to maintain his interest."
Plaintiff ended her testimony on this subject in the following words "After I filed for divorce, I realized I was victimized for fifteen years. I had been a wimp — I never asserted myself."
Defendant's testimony on the subject of fault, while not as extensive as that of plaintiff, is summarized in his words as follows:
"From 1976 until 1981-82 the marriage was CT Page 20-M successful. It broke down because she had very little patience with many things. She wouldn't tolerate waiting. She'd let you know if you made a mistake. In the early 1980's she described me as a `financial flop.' We rarely had my children over to our house. She had a problem with the way I handled social events. I never intentionally hurt or pushed her."
With reference to the Derby Day episode, defendant stated,
 "I had played golf starting at 7:30 a.m., finishing at 1 p.m. I called her to meet me at the club. When I left at 6:00 p.m. after eating I thought she'd follow. She came home at 10-10:30 p.m. We had an argument and slept in separate bedrooms. Next day she told me she had gone to the police department, but I don't think they were called."
The defendant has lived in Florida since January, 1992.
After examining and weighing all of the evidence on this subject, this court concludes that responsibility for the breakdown of the marriage rests with defendant.
Health:
Plaintiff appears to be in reasonably good health. Defendant underwent heart surgery in 1981, being confined to the hospital for nine days. He also appears to be in good health at the present time. He enjoys playing golf in his retirement.
Other Factors:
The parties have an equal opportunity for the future acquisition of capital, assets and income.
The contribution of the defendant in the acquisition, preservation or appreciation in value of the marital estate exceeds that of plaintiff.
Conclusion:
CT Page 20-N
After reviewing and weighing all of the evidence as it pertains to § 46b-81c C.G.S. and after giving particular attention to such predominating factors as the length of the marriage, the relative ages of the parties, their comparative contributions to the marital estate and the causes for breakdown of the marriage, this court concludes that the marital estate should be divided equally between the parties, namely 50 percent to each of them.
VI. The Distribution of Adjusted Gross Marital Estate in Accordance with the Finding Made in Articles II, III and V (Supra)
Total estate $1,079,289 Less pre-marital credit to defendant — 383,008 Total estate on hand for distribution $696,281
One-half interest of plaintiff $348,141 One-half interest of defendant $348,140
Plaintiff is Awarded Sole Title to the Following:
Condominium — Albany Avenue $29,600 West Hartford, CT — Total equity Household Furnishings 2,500 Jewelry 3,500 Fleet Bank 200 1984 Cadillac El Dorado 4,000 C.M. Annuity Plan — $10,500 a pre-marital asset --- I.R.A. Union Trust 9,800 Trust Fund for mother ($100,000 not a marital asset) --- Portion of escrow in Shawmut Bank 298,541 Total due plaintiff $348,141
Defendant is Awarded Sole Title to the Following:
No. 156 Commodore Drive — total equity $390,000 Jupiter, FL 1993 Toyota 15,000 Household Furnishings 25,000 Bank Accounts 18,800 Stock 47,500 CT Page 20-O Life insurance (C.S.V.) 1,358 I.R.A. 107,000 P.G.S. mortgage 37,500 Admiral's Cove Golf Membership 25,575 Gun collection (stipulation) 4,840 Portion of escrow in Shawmut Bank 58,575 Total due defendant $731,148
 Defendant's pre-marital credit $383,008 Defendant's 50 percent share 348,140 Total $731,148
VII. Alimony
After reviewing all of the evidence as it relates to § 46b-82 C.G.S. this court orders that the defendant pay to plaintiff as alimony the sum of $450 per week for a period of eight years.
This order shall be non-modifiable as to term only, but shall sooner terminate upon the remarriage of the plaintiff, her cohabitation with an unrelated male within the meaning of the statute, or upon the death of either party.
The purpose of this order is to provide plaintiff in her now altered marital status with the means to continue the unremarkable but comfortable lifestyle which she has heretofore enjoyed during her marriage until such time as she shall receive social security and/or other retirement benefits from her employment.
VIII. Other Orders
A. Counsel Fees
In view of the preceding orders of this court, no award of counsel fees is made to either party.
B. Health Insurance
No order was requested by either party on this subject, and none is made.
C. Life Insurance
CT Page 20-P
Defendant shall continue to maintain his present life insurance policy with Manufacturers' Trust with plaintiff as irrevocable beneficiary during such time as defendant shall be required to pay alimony under the terms of this judgment.
D. Liabilities
1. The parties shall be equally responsible for any taxes resulting from interest on the escrow accounts and shall equally share any credit resulting from the back-up tax withholding for said account, all accounts to be determined as of the date of transfer of said accounts.
2. Defendant shall pay to plaintiff forthwith the sum of $618.66 due her pursuant to pendente lite orders of this court.
3. Each party shall be solely responsible for his or her share of any federal or state capital gains tax resulting from the sale of the Simsbury residence owned jointly by the parties. The fact that defendant may avoid a tax because of his age and plaintiff may not is his good fortune.
4. Each party shall be solely responsible for all liabilities listed on his or her financial affidavit and shall hold the other party harmless in that regard.
E. Personal Property
Plaintiff shall forthwith return to defendant such of the following items belonging to him as are presently in her possession or control, i.e.:
1. Three framed pencil drawings (Adams artist)
2. One picture of defendant's father in foyer.
3. One carving of wood duck on pedestal.
4. One Canon camera. CT Page 20-Q
5. One brass ram's head.
6. Books and sporting items.
7. Hunting clothes.
F. Documents
The parties shall execute all documents necessary to carry out the orders of this court.
John D. Brennan State Judge Referee